IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| KAREN BARNES | § | |
| | § | |
| v. | § | NO. 4:23-CV-01012-SDJ-BD |
| | § | |
| ROAD CARRIERS, INC., *et al.* | § | |

**MEMORANDUM OPINION AND ORDER**

Defendants Road Carriers, Inc. and Conrado Pardillo Carou filed a motion to exclude two of plaintiff Karen Barnes's experts, Drs. Allyn Needham and Aaron Wolfson. Dkt. 33; *see* Dkts. 36 (response), 38 (reply), 40 (sur-reply). The court will deny the motion.

**BACKGROUND**

According to Barnes's complaint, Carou "was operating his tractor-trailer in the parking lot of [a] Love's Travel Mart" while "in the course and scope of his employment with" Road Carriers. Dkt. 7 (operative complaint) at 2. Carou "failed to yield the right-of-way exiting a private drive and initiated a turn with his vehicle into oncoming traffic, colliding hard into the passenger side" of Barnes's vehicle. *Id.* Barnes alleges that she was injured and "continues to suffer injuries and damages" from the collision. *Id.*

Barnes sued Carou and Road Carriers in state court, asserting a claim for negligence against both defendants and claims for negligent entrustment, negligent hiring and retention, and gross negligence against Road Carriers. Road Carriers removed the case to this court based on diversity of the parties' citizenship. Barnes then amended her complaint to add a claim of gross negligence against Carou.

Barnes designated three experts to testify as to her damages: certified economic analyst Allyn Needham, Ph.D.; forensic economist Shael Wolfson, Ph.D.; and certified life-care planner and rehabilitation counselor Aaron M. Wolfson, Ph.D. *See* Dkts. 33-3, 36. Road Carriers moved to exclude the testimony of Dr. Needham, who prepared a report calculating Barnes's loss of earning

capacity, and Dr. Aaron Wolfson, who prepared a life-care plan calculating the cost of Barnes's future medical treatment. Dkts. 33-1, 33-2.

According to his report, Dr. Needham calculated Barnes's lost earning capacity—the difference between what she could have earned had she not been injured and what she can expect to earn at her next job—based on "techniques commonly used in the field of economics." Dkt. 33-1 at 2, 5. To make his calculation, he reviewed several documents, including Barnes's past W-2s and Dr. Wolfson's life-care plan, and researched information from several other sources, including the United States Social Security Administration. Then, after applying the "below market discount rate method" to "discount future losses to present value," and assuming retirement at age 62, the most common age for women in the United States to seek their initial retirement benefits, he calculated Barnes's total lost earning capacity as $827,574. *Id.* at 4–5.

According to his report, Dr. Wolfson generated his life-care plan "in accordance with the [International Association of Rehabilitation Professionals ("IARP")] and [International Commission on Health Care Certification ("ICHCC")] standards." Dkt. 33-2 at 15; *see id.* at 12. The plan includes a calculation of costs for the medical treatment that Barnes will need throughout the rest of her life, including procedures, routine future medical care, projected evaluations, therapeutic modalities, medications, laboratories and diagnostics, and outpatient rehabilitation. In creating his report, Dr. Wolfson reviewed Barnes's medical records, consulted with two of Barnes's doctors, Dr. Gabriel Jasso and Dr. Karen Benner, and interviewed Barnes. He also attached to his report summaries of his consultations with Barnes's doctors. Dkt. 36-2 at 46–50. Dr. Wolfson asked the doctors to sign and return the summaries to him with any changes they might have. Neither doctor signed or returned either summary. To determine the costs for Barnes's treatments, Dr. Wolfson used "usual, customary, and reasonable . . . pricing exclusive of professional discounts or contracted, 'allowable' rates." *Id.* In his view, the costs would total $2,721,957.59 on the low end and $4,105,238.71 on the high end. *Id.* at 15.

2

## LAW

Federal Rule of Evidence 702 governs the admissibility of expert testimony. It was amended a couple of years ago to provide:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> **(b)** the testimony is based on sufficient facts or data;
>
> **(c)** the testimony is the product of reliable principles and methods; and
>
> **(d)** the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

The 2023 advisory committee note explains that the amendment was meant to (1) "clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule" and (2) "emphasize that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology."

In *Daubert v. Merrell Dow Pharmaceuticals*, the Supreme Court instructed courts to serve as gatekeepers when applying Rule 702 to determine whether expert testimony should be presented to the jury. 509 U.S. 579, 589–95 (1993). Courts must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). That "gate-keeping obligation applies to all types of expert testimony, not just scientific testimony." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 244 (5th Cir. 2002).

Under the *Daubert* test, which examines the underlying theory on which an expert opinion is based, "[t]he proponent need not prove to the judge that the expert's testimony is correct, but she

3

must prove by a preponderance of the evidence that the testimony is reliable." *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir. 1998). The court's inquiry is flexible, in that "[t]he relevance and reliability of expert testimony turns upon its nature and the purpose for which its proponent offers it." *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).

The Fifth Circuit explained several decades ago that, "[a]s a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the [factfinder's] consideration." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987). And although the 2023 advisory committee note to Rule 702 criticized unspecified judicial decisions concluding that "critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility," it also acknowledged that "[s]ome challenges to expert testimony will raise matters of weight rather than admissibility even under the [Federal] Rule 104(a) standard," which is less permissive than Rule 104(b). *Compare* Fed. R. Evid. 104(a) (providing that "[t]he court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible") *with id.* R. 104(b) (providing that "[w]hen the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist" and that "[t]he court may admit the proposed evidence on the condition that the proof be introduced later"). In other words, "once the court has found it more likely than not that the admissibility requirement has been met, any attack by the opponent will go only to the weight of the evidence." Fed. R. Evid. 702, advisory cmte. n. to 2023 amendment.

It remains the case that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *see also Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004) (explaining that, "[a]lthough the *Daubert* analysis is applied to ensure expert witnesses have employed reliable principles and methods in reaching their conclusions, the test does *not* judge the expert conclusions themselves"). Although "the district court must act as a gatekeeper to exclude all irrelevant and unreliable expert testimony, 'the rejection of expert

4

testimony is the exception rather than the rule.'" *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 294 (5th Cir. 2019) (quoting Fed. R. Evid. 702 advisory cmte. n. to 2000 amendment).

## DISCUSSION

### I. Dr. Needham

The defendants ask the court to exclude Dr. Needham's opinion testimony because Dr. Needham (A) assumed that Barnes will never return to work when calculating her lost earning capacity, (B) assumed that Barnes will retire at the most common retirement age for a female, (C) did not subtract Barnes's disability benefits from his calculation, and (D) did not consider whether Barnes's lost earning capacity was caused by the collision. None of those objections is sufficient.

### A. Returning to work

The defendants argue that Dr. Needham's calculations for Barnes's lost earning capacity are unreliable because they assume that Barnes will never return to work even though one of her doctors said that she was only temporarily unable to work. Barnes argues that it would have been speculative for Dr. Needham to specify when she might return to work and that any criticism of Dr. Needham's decision goes to the weight, not the admissibility, of his opinion. She adds, though, that Dr. Needham did not assume that Barnes would never return to work. Rather, he created a chart showing what Barnes's lost earning capacity would be if she returned to work anytime between the ages of 48 and 62, the latter age being what Dr. Needham considered the most-common retirement age for women. The defendants argue that the chart does not resolve their objection because they suspect Dr. Needham still intends to tell the jury that Barnes suffered the full damages amount, not any lesser amount shown in the chart. In Barnes's view, though, that criticism is not grounds for excluding Dr. Needham's testimony because the defendants may attempt to disprove Dr. Needham through cross-examination at trial.

The defendants rely on *Guile v. United States*, a medical-negligence case. 422 F.3d 221, 227 (5th Cir. 2005). Agreeing with the district court that the plaintiff had not presented sufficient

evidence of a breach of the standard of care, the Fifth Circuit found in *Guile* that the expert's opinions at trial were "unsupported by any data," contradicted by his later testimony, or "nothing but his incorrect factual assumptions based on examination of incomplete records." *Id.* at 227. The court determined that the expert's opinions were of no use to the jury and therefore insufficient to support the verdict.

*Guile* does not control here. For one thing, Dr. Needham did not assume that Barnes would never return to work. As Barnes notes, the chart in his report assumed that she could return to work between the ages of 48 and 62. And in forming his opinion, Dr. Needham relied on Dr. Wolfson's report, which itself relied on information from Barnes's doctor and a review of Barnes's medical records.

The report also stated that Barnes "is currently experiencing *a temporary total loss in wage earning capacity*" but that her "vocational prognosis is **guarded pending further updates on work status and permanent restrictions.**" Dkt. 33-2 at 11 (emphases in original). In other words, Barnes was not working when Dr. Needham formed his opinion, and there was no indication of when, if ever, she could return to work. Dr. Needham's opinion is sufficiently supported to go to the jury. *See Matter of Kirby Inland Marine, LP*, No. 1:23-CV-00168-MJT-ZJH, 2024 WL 5256494, at *6 (E.D. Tex. Dec. 11, 2024) (concluding that a defendant's challenge to an expert's assumption that the plaintiff would never return to work went to "the weight of the evidence, not its admissibility, and should be tested at trial"); *see also Wine v. Comer*, 590 F. Supp. 3d 1200, 1209 (E.D. Mo. 2022) (stating that "[w]hether plaintiff is capable of reentering the workforce is a foundation for [the expert's] opinion and a question of fact, which goes to the weight of his testimony, not to its admissibility").

### B. Retirement age

The defendants next argue that Dr. Needham's opinion is unreliable because it assumes that, absent her injuries, Barnes would work until age 62. In Barnes's view, that criticism likewise goes to the weight, rather than the admissibility, of the evidence.

On this point, too, the court agrees with Barnes. Like his assumption that Barnes may never return to work, Dr. Needham's assumption that Barnes would retire at the most common retirement age for women is sufficiently supported. Dr. Needham relied on data from the Social Security Administration to determine that age. And although Barnes may have preexisting conditions, nothing suggests that those conditions would necessarily lead Barnes to retire sooner. Barnes could of course retire sooner or later than average, and that is something the jury could, and presumably would, take into consideration.

*Madore v. Ingram Tank Ships, Inc.*, 732 F.2d 475 (5th Cir. 1984), illustrates the point. Discussing a computation of damages based on the plaintiff's anticipated future earnings, the Fifth Circuit acknowledged there that "[i]t may be shown by evidence that a particular person, by virtue of his health or occupation or other factors, is likely to live and work a longer, or shorter, period than the average." *Id.* at 478 (emphasis removed). But "[a]bsent such evidence, . . . computations should be based on the statistical average." *Id.* Even if *Madore*, a maritime case, may not control here, *see Kinny v. IBM Corp.,* No. A-20-CV-00969-DAE, 2022 WL 2653895, at *3 (W.D. Tex. July 8, 2022), it still informs the analysis, *see, e.g.*, *Johnston v. Harris Cnty. Flood Control Dist.*, 869 F.2d 1565, 1580–81 (5th Cir. 1989); *Crompton v. Graphic Packaging Int'l, LLC*, No. 5:20-CV-00095-RWS, 2021 WL 7308034, *3 (E.D. Tex. Nov. 22, 2021). It reflects the common-sense point that an expert may permissibly rely on statistical averages to calculate retirement age. Dr. Needham's reliance on the most common retirement age for women according to the Social Security Administration is not a basis for exclusion.

That conclusion also finds support in *Garcia v. City of Amarillo*, a case in which an expert calculated lost retirement benefits by assuming retirement at the age the plaintiff planned to retire and death at the average life expectancy. No. 2:18-CV-95-Z-BR, 2020 WL 5642763, at *7 (N.D. Tex. Feb. 26, 2020). The defendant argued that the expert's report was unreliable because it "utilize[d] life expectancy assumptions based on government statistics but fail[ed] to consider Plaintiff's actual age, health, lifestyle, and other individual factors." *Id.* The court rejected that

argument, holding that the issue was "best left to proper cross examination." *Id.* The same is true here.

### C. Disability benefits

The defendants argue that Dr. Needham's calculation fails to account for Barnes's disability benefits. Barnes argues, again, that the defendants' criticism goes to the weight and not the admissibility of the evidence—and also that disability payments are collateral sources of income that cannot reduce her recovery. On that latter point, the defendants reply that, under the collateral-source rule, Barnes's disability benefits may be inadmissible, but that Dr. Needham still had to consider them when assessing lost earning capacity. They add that it is not clear that the collateral-source rule would even apply absent evidence that the disability benefits were awarded based on injuries caused by the collision.

"The collateral source rule is a substantive rule of law." *Davis v. ODECO, Inc.*, 18 F.3d 1237, 1243 (5th Cir. 1994). So in this diversity case, the court looks to state law to define its contours. *Gasperini v. Ctr. for Humans., Inc.*, 518 U.S. 415, 427 (1996) (stating that, "[u]nder the *Erie* doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law"). As the Texas Supreme Court has explained, the longstanding collateral-source rule

> precludes any reduction in a tortfeasor's liability because of benefits received by the plaintiff from someone else—a collateral source. Thus, for example, insurance payments to or for a plaintiff are not credited to damages awarded against the defendant. The theory behind the collateral source rule is that a wrongdoer should not have the benefit of insurance independently procured by the injured party, and to which the wrongdoer was not privy.

*Haygood v. De Escabedo*, 356 S.W.3d 390, 394–95 (Tex. 2011) (footnotes and quotation marks omitted). "Married to this substantive rule is an evidentiary rule that proscribes introduction of evidence of collateral benefits out of a concern that such evidence might prejudice the jury." *Davis*, 18 F.3d at 1243.

The parties have not cited binding precedent addressing whether the collateral-source rule prohibits an expert from considering collateral sources of income in calculating lost earning

8

capacity. But this court's opinion in *Kirby* offers some guidance. There, the petitioner argued that an expert's total projection of the claimant's future medical costs was not relevant because it did not account for the claimant's veteran benefits, which would offset his personal costs for future care. 2024 WL 5256494, at *3. In response, the claimant argued that evidence regarding his benefits would likely be excluded at trial under the collateral-source rule and that the expert's opinion should be allowed in, subject to challenge by opposing experts and cross examination. *Id.* The court agreed with the claimant, identifying the matter as a point "to decide at trial." *Id.*

The defendants' arguments here likewise fail, as Dr. Needham's report is more likely than not reliable. "Widespread acceptance can be an important factor in ruling particular evidence admissible," *Daubert*, 509 U.S. at 594, and the report stated that Dr. Needham based his calculations on "techniques commonly used in the field of economics." Dkt. 33-1 at 5. His education and professional background indicate that he likely knows what those techniques are. He "received [a] Ph.D. in Business Administration from California Coast University," a "master's degree in economics from Texas Christian University, and a bachelor's degree in business administration and economics from Austin College." Dkt. 36 at 11 n.1. He is also a "Certified Economic Analyst," *id.*, and has been a consulting economist for nearly 30 years, Dkt. 36-1 at 11.

Further, a holistic review of the report does not suggest that Dr. Needham's techniques were unreliable or unreliably applied to the facts of the case. Dr. Needham considered Dr. Wolfson's report, which discussed Barnes's work history. He also considered Barnes's past pay stubs, W-2s, and tax forms. He then explained each step in calculating Barnes's lost earning capacity. He began by calculating her post-injury earning capacity using her pay stubs from the year that she stopped working. He then applied a projected annual income growth rate equal to the projected inflation rate, deducted income taxes, applied a benefit factor to account for the value of employer-provided benefits, applied a retirement age, and then discounted future losses to present value. He also attached tables to his report showing his calculations. Those are all indicia of reliability that, viewed alongside Dr. Needham's experience, demonstrate that the report is more likely than not reliable.

Indeed, the court has previously denied a similar motion to exclude Dr. Needham's calculation of lost earning capacity. In *Greger v. C.R. Bard, Inc.*, Dr. Needham opined on another plaintiff's lost earning capacity. No. 4:19-CV-00675-SDJ, 2021 WL 3855474, at *15 (E.D. Tex. Aug. 30, 2021). He first calculated her pre-injury earning capacity by averaging her income before her injury and then calculated her post-injury earning capacity using her income from the year of her injury. *Id.* He applied an annual rate of inflation to those two numbers and deducted applicable taxes. *Id.* Finally, he multiplied both numbers out to the plaintiff's expected retirement age. *Id.* The court rejected the defendant's argument that Dr. Needham's methodology and conclusion were unreliable because he should have considered the plaintiff's tax returns, medical conditions, and industry earning potential in addition to just the plaintiff's W-2 and K-1 tax forms, explaining that "courts routinely conclude that similar or less robust lost-earnings calculations are reliable." *Id.*

That explanation applies equally here. If the defendants maintain their position that Dr. Needham should have considered Barnes's disability benefits, they may pursue "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" at trial. *Daubert*, 509 U.S. at 596. They are not entitled to preclude the jury from even hearing Dr. Needham's opinion.

### D. Causation

For the first time in their reply brief, the defendants argue that Dr. Needham failed to consider whether, based on the medical opinion of a licensed physician, Barnes's lost earning capacity was caused by the collision. Although the court could ordinarily deem that argument forfeited, Barnes did not argue forfeiture and, in fact, addressed the argument in her sur-reply. So any forfeiture argument has itself been forfeited, *see Rollins v. Home Depot USA, Inc.*, 8 F.4th 393, 397 (5th Cir. 2021); *Garlington v. O'Leary*, 879 F.2d 277, 282 (7th Cir. 1989), and the court will consider the defendants' argument, *see United States v. Ramirez*, 557 F.3d 200, 203 (5th Cir. 2009) (exercising discretion to address the merits of an issue not raised in the district court or an opening brief because, although the court generally "does not entertain arguments raised for the first time in a

reply brief," it "views the situation differently when a new issue is raised in the appellee's brief and the appellant responds in his reply brief").

Barnes maintains that Dr. Needham considered causation because her doctor, Dr. Benner, said that she could not return to work due to the collision. She adds that Dr. Needham was permitted to rely on Dr. Benner's opinion. A damages expert, however, is "allowed to assume liability and address only the issue of damages." *Robroy Indus.-Tex., LLC v. Thomas & Betts Corp.*, Nos. 2:15-CV-00512-WCB, 2:16-CV-00198-WCB, 2017 WL 1319553, at *4–5 (E.D. Tex. Apr. 10, 2017); *see D. Hous., Inc. v. Love*, 92 S.W.3d 450, 454 (Tex. 2002) (reflecting that causation is an element of liability). Dr. Needham is a damages expert. He is not a causation expert and has not opined on causation. As such, he did not need to rely on Dr. Benner to reach a reliable conclusion on damages. The defendants' argument on the sufficiency of Barnes's causation evidence will be addressed separately. *See, e.g.*, Dkt. 50 (pending motion for partial summary judgment teeing up, among other issues, proximate cause).

## II. Dr. Wolfson

The defendants ask the court to exclude Dr. Wolfson as an expert because he (A) did not explain whether the future medical treatment calculated in Barnes's life-care plan was either prescribed by a doctor or caused by the collision, (B) failed to consider Barnes's disability benefits when creating his life-care plan, and (C) failed to consider contract rates for medical treatment. None of those objections is sufficient.

### A. Causation and speculation

The defendants fault Dr. Wolfson for failing to explain whether the medical treatment included in his life-care plan was causally connected to the collision, as opposed to Barnes's preexisting health condition or comorbidities. They add that, because Dr. Wolfson did not identify any doctor who prescribed the treatment, whether Barnes would actually need or undergo the treatment is speculative.

11

Barnes counters that Dr. Wolfson is not a medical doctor and was permitted to rely on the medical opinion of Barnes's physicians as to her future medical needs. And because Dr. Wolfson relied on those medical opinions, Barnes argues that the treatment identified in his report is not speculative. The defendants, however, object to the summaries of the doctors' opinions attached to Barnes's response, stating that they were not disclosed in accordance with Rule 26(a)(2)(B). The defendants further assert that, because the summaries were not signed by the doctors, they do not definitively show whether the doctors agreed with them.

On these points, too, Barnes has the better argument at this stage.

The defendants' causation-based challenges to Dr. Wolfson's report fail for the same reason that their similar challenges to Dr. Needham's report fail. Dr. Wolfson is not a causation expert and has not opined on causation; he is a damages expert and, as such, could properly assume causation. *See supra* Part I.D. And the defendants are incorrect that Dr. Wolfson's report did not identify any doctor who prescribed the treatment mentioned in the life-care plan. In the plan's "comments" section, Dr. Wolfson identified which doctor recommended each listed treatment. Dkt. 33-2 at 13. And the summaries show that the treatments identified in the life-care plan are the same treatments recommended by Barnes's doctors during their consultations with Dr. Wolfson. Dkt. 36-2 at 47, 50.

Those points are enough to overcome the defendants' challenge. But it is worth adding, as Barnes points out, that another court likewise declined to exclude Dr. Wolfson on similar grounds. In *Murray v. McKee*, the court rejected an effort to exclude Dr. Wolfson's testimony based on an assertion that Wolfson did not "fully consider [the plaintiff's] prior and subsequent accidents in forming his opinion" on lost wages. No. CV 20-2979, 2023 WL 5950129, at *1 (E.D. La. July 21, 2023). The court noted that "[a]ny inconsistencies or weaknesses in Dr. Wolfson's testimony are ripe for cross-examination" but were "not grounds to prevent his testimony entirely." *Id.* at *3. Once again, the defendants can pursue their causation argument later.

The defendants' objections to the summaries are also unavailing. The disclosure objection is moot because Barnes has supplemented her Rule 26(a)(2)(B) disclosures to include the summaries. *See* Dkts. 41 (motion), 42 (order). And the credibility objection fails.

As already noted, "once the court has found it more likely than not that the admissibility requirement has been met, any attack by the opponent will go only to the weight of the evidence." Fed. R. Evid. 702, advisory cmte. n. to 2023 amendment. The defendants' second objection goes to the source of Dr. Wolfson's life-care plan—that is, whether the summaries accurately reflect what Barnes's doctors said to Dr. Wolfson during his consultations with them. Because the court finds it more likely than not that the admissibility requirement has been met, *see infra* Part II.B, that objection is a matter for the jury. *Viterbo*, 826 F.2d at 422 (explaining that "questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration").

Other courts have reached the same conclusion. In *Richard v. DG Louisiana LLC*, for instance, the court addressed a life-care plan that Dr. Wolfson prepared "based on a clinical interview with [the] plaintiff, [a] consultation with [the plaintiff's doctor], and a review of [the] plaintiff's records." No. 2:21-CV-03633, 2023 WL 8418043, at *2 (W.D. La. May 9, 2023). After the consultation, Dr. Wolfson sent a summary of the doctor's recommendations to him to review, sign, and record any changes. *Id.* There was no indication that the doctor changed or disagreed with anything in the summary. *Id.* Dr. Wolfson then included, as a line item in his life-care plan, a course of injections based on the doctor's recommendation. *Id.* at *1. At the doctor's subsequent deposition, however, he testified to something other than what was in the life-care plan. *Id.* at *2. He said that because the plaintiff reported that her pain had not returned since receiving one of the injections, he would not recommend another. *Id.* The defendant then moved to strike the part of Dr. Wolfson's report that mentioned the injections. *Id.* at *1. The court denied the motion, concluding that "[d]ivergences between the doctor's testimony and what [Dr.] Wolfson says they told him create 'an issue of fact for the jury to resolve and not a proper basis for exclusion under *Daubert*.'" *Id.* at *2.

13

Similarly, in *Smith v. DG Louisiana, LLC*, Dr. Wolfson consulted with the plaintiff's doctors and sent them a summary of their recommendations. 499 F. Supp. 3d 280, 286 (M.D. La. 2020). He again instructed the doctors to review, denote any changes, sign, and return the summaries. *Id.* None of the doctors made any changes. *Id.* But three of them later testified to something different from what Dr. Wolfson included in his summaries—namely, that some of the treatment was either not connected to the injury at issue or was not recommended at all. *Id.* at 283. The defendant moved to exclude Dr. Wolfson's testimony as to the recommended treatments from the three doctors. *Id.* at 284. In denying the defendant's motion, the court explained that whether "there is a conflict between what [Dr.] Wolfson swears the doctors told him and what they testified to in their depositions" is "an issue of fact for the jury to resolve and not a proper basis for exclusion under *Daubert.*" *Id.* at 287.

### B. Disability benefits

The defendants next raise the same argument about Dr. Wolfson's life-care plan calculation that they raised as to Dr. Needham's report: that it is unreliable because it does not take Barnes's disability benefits into account. Barnes's response is also the same: the defendants' criticism goes to the weight, not the admissibility, of the evidence, and disability benefits are collateral sources of income that cannot reduce her recovery.

As with Dr. Needham, the court need not decide whether the collateral-source rule applies because Dr. Wolfson's report bears sufficient indicia of reliability to satisfy Rule 702. As already noted, applying techniques that are commonly used in a particular field demonstrates reliability. *Daubert*, 509 U.S. at 594. In his report, Dr. Wolfson states that his "life care plan was generated in accordance with the IARP and ICHCC standards" and that "[i]t represents requirements as [he] understand[s] them, as determined through research with suppliers, vendors, care providers, and others." Dkt. 33-2 at 15. Dr. Wolfson's background also indicates that, more likely than not, Dr. Wolfson knew the method that others in his field would follow for creating a life-care plan. Dr. Wolfson is a member of the Texas and Louisianna chapters of the IARP and has several related

certifications, including being a certified ICHCC life-care planner. He has also received his "postgraduate life care planning degree from the University of Florida (Intelicus)," Dkt. 36 at 12 n.2, and published work in the field of life-care planning, Dkt. 36-2 at 24.

Dr. Wolfson also relied on reliable sources. At least two other courts have found Rule 702 satisfied when the expert creating a life-care plan relied on an evaluation with the plaintiff, the plaintiff's medical records, and interviews with the plaintiff's doctors. *Malone v. Spence*, No. 3:21-CV-2047-BH, 2023 WL 5106878, at *3–4 (N.D. Tex. Aug. 9, 2023); *Roach v. Hughes*, No. 4:13-CV-00136-JHM, 2015 WL 3970739, at *3 (W.D. Ky. June 30, 2015). Like the experts in those cases, Dr. Wolfson relied on a clinical interview with Barnes, Barnes's medical records from after the collision, and consultations with Barnes's doctors. As with Dr. Needham, if the defendants believe that Dr. Wolfson should also have considered Barnes's disability benefits, they can take it up through "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert*, 509 U.S. at 596.

### C. Actual costs

The defendants' final argument is that Dr. Wolfson's life-care calculation is unreliable because it does not account for the actual costs of the recommended medical treatment based on contract rates—that is, "allowable" or Medicare rates. Barnes responds that, in addition to the repeated fault of attacking the weight, rather than the admissibility, of the evidence, that objection fails because the jury can hear Dr. Wolfson's testimony under Texas law regardless of Rule 702.

Barnes is not entirely correct on this point. Federal courts sitting in diversity "look to state law only to determine the general *kind* of evidence necessary to establish a particular state law cause of action." *Wackman v. Rubsamen*, 602 F.3d 391, 400 & n.2 (5th Cir. 2010). Texas substantive law does not require any "precise evidence" for a jury to award damages for future medical expenses. *JMI Contractors, LLC v. Medellin*, No. 04-22-00072-CV, 2024 WL 3954210, at *14 (Tex. App.—San Antonio Aug. 28, 2024, pet. filed); *Brazos Contractors Dev., Inc. v. Jefferson*, 596 S.W.3d 291, 311 (Tex. App.—Houston [14th Dist.] 2019, pet. denied); *Hughett v. Dwyre*, 624 S.W.2d 401, 405

15

(Tex. App.—Amarillo 1981, writ ref'd n.r.e.). Here, that means that Barnes will not have to provide expert testimony on the exact calculation of her medical costs and that the jury will decide what damages to award. *See id.* But Barnes wants to use Dr. Wolfson's testimony to inform the jury's decision. "Admissibility, competency, and reliability of a particular expert's testimony are governed by federal standards," not state law. *Wackman*, 602 F.3d at 400 n.2. For Dr. Wolfson to testify, Barnes therefore needs to show satisfaction of Rule 702, and it is the court's duty under that rule to decide at this stage whether his testimony should be presented to the jury. *See Daubert*, 509 U.S. at 589–95.

Dr. Wolfson's testimony satisfies the Rule 702 standard. Because Dr. Wolfson's calculation is sufficiently supported, it is reliable and would not properly be excluded. *See Crompton*, 2021 WL 7308034, at *2. In addition to the points already noted, Dr. Wolfson's report relied on "usual, customary, and reasonable (UCR) pricing." Dkt. 33-2 at 12. The defendants' assertion that Dr. Wolfson's pricing does not include contract rates is unavailing. The amount of money that each recommended medical treatment would cost is a basis, not a method, for calculating Barnes's future medical expenses. *See Hanan v. Crete Carrier Corp.*, No. 3:19-CV-0149-B, 2020 WL 584370, at *5–6 (N.D. Tex. Feb. 6, 2020); *Koenig v. Beekmans*, No. 5:15-CV-0822-OLG, 2017 WL 7732809, at *3 (W.D. Tex. Mar. 23, 2017). Because it is more likely than not that the admissibility requirement has been met, the defendants' attack "go[es] only to the weight of the evidence," Fed. R. Evid. 702, advisory cmte. n. to 2023 amendment, and is therefore a matter for the jury, *see Viterbo*, 826 F.2d at 422.

### III. The Parties' Other Requests

Notwithstanding Local Rule CV-7(a), which requires motions and responses to be filed as separate documents, both parties ask the court for additional relief. In her response, Barnes asks the court to postpone ruling on the defendants' motion until after the experts have been deposed. In their reply, the defendants ask the court to exclude certain legal conclusions made by the experts.

And in her sur-reply, Barnes asks the court to strike the defendants' reply. None of those improperly presented requests will be granted.

## CONCLUSION

The motion to strike, Dkt. 33, is **DENIED**.

So **ORDERED** and **SIGNED** this 31st day of March, 2025.

_____
Bill Davis
United States Magistrate Judge